# In the United States Court of Federal Claims

No. 18-607C

(Filed: April 28, 2020)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

|  |  |  |
|---|---|---|
| BP AMERICA PRODUCTION COMPANY, | * * * | 30 U.S.C. § 1721 (2012); Fixing America's Surface Transportation Act; Federal Oil and Gas Royalty Management Act of 1982; Royalty Simplification and Fairness Act of 1996; Motion to Dismiss; Motion for Summary Judgment; Tucker Act; Federal Savings Statute; Anti-Deficiency Act; Subject-Matter Jurisdiction; RCFC Rule 12; RCFC Rule 56; Retroactivity. |

BP AMERICA PRODUCTION
COMPANY,

                  Plaintiff,

v.

THE UNITED STATES,

                  Defendant.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

*Peter J. Schaumberg*, with whom was *James M. Auslander*, Beveridge & Diamond, P.C., Washington, D.C., for Plaintiff BP America Production Company.

*Isaac B. Rosenberg*, with whom were *Robert E. Kirschman, Jr.*, Director, *Patricia M. McCarthy*, Assistant Director, Commercial Litigation Branch, *Joseph H. Hunt*, Assistant Attorney General, U.S. Department of Justice, Washington, D.C., and *David L. Kearney*, Rocky Mountain Regional Solicitor's Office, U.S. Department of the Interior, Lakewood, Colorado, for Defendant.

## OPINION AND ORDER

WHEELER, Judge.

    Plaintiff BP America Production Company ("BP") holds over 150 leases to extract oil and gas deposits from federally-owned lands in New Mexico. One of the terms of those leases is that BP must pay royalties to the Government on the value of oil and gas removed or sold from those lands. In this case, BP alleges that it is owed $1,323,721.86 in overpayment interest on certain royalty payments.

    Now before the Court are the parties' cross-motions for summary judgment and the Government's motion to dismiss for lack of subject-matter jurisdiction. For the reasons

discussed below, the Court DENIES the Government's motion to dismiss and cross-motion for summary judgment and GRANTS BP's motion for summary judgment.

## Background

I.      The Statutory Background

The Fixing America's Surface Transportation ("FAST") Act, the Federal Oil and Gas Royalty Management Act of 1982 ("FOGRMA"), and the Royalty Simplification and Fairness Act of 1996 ("RSFA"), collectively codified at 30 U.S.C. §§ 1701–59, along with their implementing regulations, govern oil and gas leases and the royalty reporting, payment, and receipt process.  For simplicity's sake, the Court refers to these provisions collectively as "FOGRMA" in this opinion.  FOGRMA allows lessees to make estimated royalty payments, with the actual royalty amount due the following month.  30 U.S.C. § 1721(h).  Of course, estimated payments are often wrong; sometimes lessees underpay, and sometimes they overpay.  Before it was modified by the FAST Act, FOGRMA had provisions addressing both of these eventualities:

> (h) Lessee or designee interest
>
> > Interest shall be allowed and paid or credited on any overpayment, with such interest to accrue from the date such overpayment was made, at a rate equal to the sum of the Federal short-term rate determined under section 6621(b) of Title 26 plus 1 percentage point. Interest which has accrued on any overpayment may be applied to reduce an underpayment. . . .
>
> . . .
>
> (j) Estimated payment
>
> > . . .
>
> > If the estimated payment was less than the amount of actual royalties due, interest is owed on the underpaid amount. If the estimated payment exceeds the actual royalties due, interest is owed on the overpayment.  If the lessee or its designee makes a payment for such actual royalties, the lessee or its designee may apply the estimated payment to future royalties. . . .

§ 1721(h)-(j) (2014).

Pre-FAST Act, FOGRMA also provided a source of funds the Government was to use to fund interest payments to lessees that had overpaid their estimated royalties. Specifically, the relevant provision stated that:

> (h) Lessee or designee interest
>
> . . .
>
> Such interest shall be paid from amounts received as current receipts from sales, bonuses, royalties (including interest charges collected under this section) and rentals of the public lands and the Outer Continental Shelf under the provisions of the Mineral Leasing Act, and the Outer Continental Shelf Lands Act, which are not payable to a State or the Reclamation Fund. . . .

§ 1721(h) (2014).

As relevant to this litigation, Section 32301 of the FAST Act modified FOGRMA in two important ways. First, it eliminated the former § 1721(h). As a result, FOGRMA no longer contains a source of funds that the government may use to make interest payments to lessees that have overpaid their estimated royalties. The FAST Act also removed the language from the former § 1721(j) that authorized the Government to pay interest on royalty overpayments. Thus, the renumbered § 1721(h) now reads:

> (h) Estimated payment
>
> If the estimated payment was less than the amount of actual royalties due, interest is owed on the underpaid amount. If the lessee or its designee makes a payment for such actual royalties, the lessee or its designee may apply the estimated payment to future royalties.

So, as reconstituted by the FAST Act, FOGRMA no longer gives the Government the legal authority or a source of funding to pay interest on royalty overpayments. However, Congress did not make clear in the FAST Act whether the provisions eliminating the authority to pay interest on royalty overpayments were retroactive.

II.     The Facts of This Case

The facts of this case, while complicated, are uncontested. They are laid out in full in the parties' Joint Stipulation of Facts. Dkt. 34. As relevant to this opinion, the facts are as follows.

BP holds over 150 leases that allow it to extract oil and gas from Government-owned lands in New Mexico. Dkt. 34 at 1. These leases are managed by the Department of the Interior's Office of Natural Resources Revenue ("ONRR"). Id. at 2. One of the terms of those leases is that BP report and pay royalties to the Government on the value of oil and gas removed or sold from Government lands, as required by FOGRMA and its implementing regulations. Id. at 1. At all times relevant to this litigation, BP dutifully reported and paid the royalties. Id. at 2–4. BP sometimes overpaid its royalty obligations, and sometimes underpaid them. Id. at 4–5. The upshot of all of this is that by December of 2015, BP had accumulated hundreds of thousands of dollars in overpayment interest. See id. at 9.

Neither BP nor ONRR idly let this interest accumulate. On December 8, 2015, ONRR informed BP that BP was owed $916,539.65 in overpayment interest. Id. On February 1, 2016, BP requested that ONRR credit this overpayment interest towards BP's January 2016 royalty obligations, which ONRR did. Id. at 9–10. Notably, all of this occurred after President Obama signed the FAST Act into law on December 4, 2015. See id. at 13. On May 10, 2016, ONRR issued what is known as a "Dear Payor" letter, in which it explained that ONRR would no longer pay interest on overpayments, and that in some cases it would have to adjust invoices which included overpayment interest that it had issued after the FAST Act became law. Id. at 13.

True to its word, on June 15, 2016, ONRR sent BP a demand for payment and an invoice for $956,792.96 that ONRR said BP owed. Id. at 13. ONRR subsequently made clear that BP owed the money because ONRR no longer had the legal authority to credit overpayment interest towards BP's royalty obligations. See id. at 14. BP subsequently paid ONRR the full $956,792.96. Id. The parties have stipulated that if BP is entitled to overpayment interest, ONRR owes BP a total of $1,323,721.86. Id. at 14.

ONRR's demand for payment included a section informing BP of its rights to appeal ONRR's demand under 30 C.F.R. § 1290.105. See Dkt. 34-9 at 1–2. That section explained that BP had 30 days in which to file an appeal. Id. at 2. BP did not file an administrative appeal. Instead, it brought suit in this Court.

III.    Procedural History

BP filed its complaint in this Court on April 27, 2018. Dkt. 1. In its complaint, BP made two claims. The first claim, Count I, was for the Government's alleged failure to pay a statutory money-mandating obligation. Id. at 8. The second claim, Count II, was for the Government's alleged breach of contract. Id. at 9. The Government moved to dismiss the complaint for lack of subject-matter jurisdiction and failure to state a claim on August 26, 2018. Dkt. 7. On April 1, 2019, the Court denied the Government's motion to dismiss with respect to Count I and granted it with respect to Count II, in an opinion reported at BP Am. Prod. Co. v. United States, 142 Fed. Cl. 446, 456 (2019). A brief discussion of the

4

Court's opinion is merited, because the opinion bears directly on the Government's new motion to dismiss and the parties' cross-motions for summary judgment.

The Government's first argument in its original motion to dismiss was that the Court lacked subject-matter jurisdiction.  Id. at 452.  The Government had three reasons for staking out this position.  First, it said that FOGRMA had replaced the Tucker Act as the means of bringing oil and gas royalty-related claims against the federal government.  Id.  Second, it said that BP had failed to exhaust its statutorily mandated administrative remedies.  Id.  Finally, it said that BP's claims were time-barred.  Id.  The Court addressed and rejected each of these arguments in turn.

First, the Court ruled that it had Tucker Act jurisdiction over BP's claims.  Id.  After reviewing FOGRMA's purpose, text, and structure, the Court concluded that FOGRMA did not displace the Court's Tucker Act jurisdiction over BP's claims.  Id.  The Court reached this conclusion for two reasons.  One was that as modified by the FAST Act, FOGRMA provided no mechanism for BP to get relief on its claims, because it took away ONRR's power to make royalty overpayment interest payments.  Id. at 453.  The other was that the FAST Act repealed the FOGRMA provisions that empowered ONRR to pay overpayment interest.  Id. at 453–54.  The Court further held that Tucker Act jurisdiction was appropriate because FOGRMA was a money-mandating source of law.  Id. at 454.

Next, the Court addressed the Government's argument that BP had failed to exhaust its statutorily mandated administrative remedies.  The Court summarily rejected this argument, because in ruling on whether it had Tucker Act jurisdiction, it had already concluded that BP's claims fell outside of the ambit of FOGRMA.  Id. at 455.  As a result, the Court concluded that FOGRMA's exhaustion requirements did not apply.  Id.

Finally, the Court ruled that BP's claims were not time-barred.  Id.  The Court noted that it was uncontested that under the statutory and regulatory scheme in place at the time it made its overpayments, BP had until at least January 31, 2016 to make a demand for overpayment interest.  Id.  However, before BP made a demand, the FAST Act was signed into law on December 4, 2015.  Id.  The Court held that BP could not be punished for failing to make its demands before the FAST Act was enacted.  See id.  Instead, the Court ruled, the enactment of the FAST Act triggered the Tucker Act's six-year statute of limitations.  Id.  Because BP brought its suit well within the six-year statute of limitations, it was not time barred.  Id.

After the Court denied the Government's motion to dismiss for lack of subject-matter jurisdiction, it turned to the Government's argument that BP had failed to raise a claim upon which relief could be granted.  Id. at 455.  Here, the Government asserted two explanations for its position: That the Court should require BP to exhaust its administrative remedies as a prudential matter, and that Count II of BP's complaint, the breach of contract claim, should be dismissed because BP did not allege that the Government breached an

obligation arising out of one of its leases. Id. The Court rejected the Government's prudential exhaustion argument. Id. at 456. "A prudential exhaustion requirement would be inappropriate," the Court wrote, as it "would neither promote judicial efficiency nor protect ONRR's authority because ONRR is not empowered to grant BP relief." Id. Moreover, "forcing BP to seek an administrative remedy would cause undue prejudice because [any remedy] would be clearly inadequate." Id. However, the Court did grant the Government's motion to dismiss Count II for failure to state a claim, because "BP d[id] not point to any lease provision that require[d] the United States to pay interest on its royalty overpayments. . . . [or] identify any provision that unambiguously incorporate[d] [FOGRMA] into its leases by reference." Id.

After the Court addressed the Government's motion to dismiss, the parties then worked diligently to produce a stipulated statement of facts, which they filed with the Court on September 25, 2019. Dkt. 34. On October 25, 2019, BP filed its motion for summary judgment, Dkt. 35, and the Government filed a cross-motion to dismiss and a cross-motion for summary judgment on November 27, 2019. Dkt. 36. After the parties filed their respective responses and replies, the Court heard oral argument on the parties' cross-motions on March 11, 2020. The parties' motions are now fully briefed and ripe for decision.

Discussion

## I.   Motion to Dismiss for Lack of Subject-Matter Jurisdiction

If the Court does not have subject-matter jurisdiction over BP's claims, then it need not—indeed, it may not—rule on the parties' cross-motions for summary judgment. As the Federal Circuit has counseled, "[i]t is well settled that limitations on subject-matter jurisdiction are not waivable; [a] court must address jurisdictional issues . . . whenever those issues come to the court's attention." St. Bernard Par. Gov't v. United States, 916 F.3d 987, 992 (Fed. Cir. 2019). Parties may raise challenges to a court's jurisdiction to hear a case at any time in the course of litigation. See id. Accordingly, before addressing the parties' cross-motions for summary judgment, the Court first considers the Government's renewed motion to dismiss for lack of subject-matter jurisdiction.

### A.   Standard of Review

Whether the Court has jurisdiction to decide the merits of a case is a threshold matter. See PODS, Inc. v. Porta Stor, Inc., 484 F.3d 1359, 1365 (Fed. Cir. 2007). When deciding a Rule 12(b)(1) motion to dismiss, a court must assume all the undisputed facts in the complaint are true and draw reasonable inferences in the non-movant's favor. Acevedo v. United States, 824 F.3d 1365, 1368 (Fed. Cir. 2016). Further, the plaintiff bears the burden of establishing facts sufficient to invoke this Court's jurisdiction by a preponderance of the evidence. Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746,

748 (Fed. Cir. 1988).  In determining whether a plaintiff has met this burden, courts may look "beyond the pleadings and 'inquire into jurisdictional facts' in order to determine whether jurisdiction exists."  Lechliter v. United States, 70 Fed. Cl. 536, 543 (2006) (quoting Rocovich v. United States, 933 F.2d 991, 993 (Fed. Cir. 1991)).

### B.  The Court Has Subject-Matter Jurisdiction

The Court granted in part and denied in part the Government's first motion to dismiss in an opinion reported at BP America Production Co. v. United States, 142 Fed. Cl. 446 (2019).  The Government now raises or re-raises three reasons why the Court lacks subject-matter jurisdiction over this case.  First, the Government says, the Court lacks jurisdiction over this case because BP did not meet the timing requirements for bringing suit under FOGRMA.  Second, the Government claims that the FAST Act did not end the requirement that lessees such as BP exhaust their administrative remedies before bringing suit.  Third, the Government argues that the General Savings Statute preserves BP's pre-FAST Act rights and responsibilities under FOGRMA.  The Court addresses each of these arguments in turn.  None of them are persuasive.

#### 1.  FOGRMA's Timing Requirements

The Government's first argument in support of its renewed motion to dismiss is that BP failed to exhaust its administrative remedies or timely file suit.  See Dkt. 36 at 24–26. The Government correctly notes that FOGRMA and its implementing regulations require a lessee challenging an action (or inaction) by ONRR to administratively appeal that action within 30 days.  E.g., 30 C.F.R. § 1290.105(a)(1)(i).  Too, as the Government asserts, FOGRMA requires lessees who are unhappy with a final agency action and wish to challenge it in court to file suit within 180 days of receiving notice of the action.  30 U.S.C. § 1724(j).  Finally, the Government notes that BP neither pursued any administrative appeal nor filed suit within 180 days of the ONRR actions that it is challenging.  Therefore, the Government says, the Court should dismiss this case, because BP failed to meet FOGRMA's jurisdictional prerequisites.  Dkt. 36 at 26.

Each of the Government's legal and factual assertions is true.  Each is also irrelevant.  The Government made a substantially similar argument in its first motion to dismiss.  See, e.g., Dkt. 7 at 37–39.  In denying that motion to dismiss, the Court wrote that "BP's claims do not fall within the ambit of FOGRMA."  BP Am. Prod. Co., 142 Fed. Cl. at 455.  Rather, they are claims made under the Tucker Act.  See id. at 452.  "As a result, FOGRMA's [timing] requirements do not apply."  Id. at 455.  It does not matter whether BP met FOGRMA's timing requirements; what matters is whether BP's suit falls within the Tucker Act's six-year statute of limitations.  It does, so BP's suit is timely.

2.  The FAST Act's Impact on Exhaustion

The Government next argues that the FAST Act did not change BP's obligation to exhaust its administrative claims.  Dkt. 36 at 27.  Even if the FAST Act rendered ONRR unable to pay or credit overpayment interest, the Government says, it still left intact the requirement that BP exhaust its overpayment interest claims before suing to enforce them. Id.  Since BP did not do this, the Government argues that the Court does not have jurisdiction over BP's claims.  Id. at 31.

Here, too, the Government is simply re-raising an argument that the Court already considered and rejected.  As the Court previously ruled, "[t]he FAST Act unambiguously revoked ONRR's power to pay interest . . . and, consequently, ONRR's power to grant BP relief on its claims."  BP Am. Prod. Co., 142 Fed. Cl. at 453.  ONRR's inability to grant BP meaningful relief is critical.  As the Court explained previously, a remedial scheme displaces the Tucker Act only if it affords a plaintiff "an 'opportunity for full relief'" on its claims.  Id.  Without that opportunity for full relief, the Tucker Act applies.  Id.; see also St. Bernard Par. Gov't v. United States, 916 F.3d 987, 995–96 (Fed. Cir. 2019).  Because the FAST Act left ONRR unable to provide full relief to BP on BP's claims under FOGRMA, the Tucker Act controls, not the FOGRMA remedial scheme.  BP Am. Prod. Co., 142 Fed. Cl. at 454.  Thus, BP's failure to exhaust its administrative remedies under FOGRMA, just like its failure to follow FOGRMA's timing requirements, is irrelevant, because "FOGRMA's exhaustion requirements do not apply."  Id. at 455.

3.  Effect of the General Savings Statute

For the first time in this litigation, the Government argues that the General Savings Statute, 1 U.S.C. § 109, offers a rule of statutory interpretation that the Court must consider when interpreting how the FAST Act affected the United States' liabilities under FOGRMA.  The General Savings statue provides in relevant part:

> The repeal of any statute shall not have the effect to release or extinguish any penalty, forfeiture, or liability incurred under such statute, unless the repealing Act shall so expressly provide, and such statute shall be treated as still remaining in force for the purpose of sustaining any proper action or prosecution for the enforcement of such penalty, forfeiture, or liability.

Id.  According to the Government, the General Savings Statute means that the pre-FAST Act FOGRMA still applies for purposes of this case; after the FAST Act was enacted, BP was still entitled to its overpayment interest, but only if it followed the administrative procedures required by FOGRMA.  Dkt. 36 at 32.  This is because the General Savings Statute, when it applies, saves not just the liabilities incurred under the repealed statute, but the "statute itself."  De La Rama S.S. Co. v. United States, 344 U.S. 386, 389 (1953).

The Government's contention appears to be that the General Savings Statue creates a mandatory rule of statutory interpretation that must lead to the preservation of the pre-FAST Act FOGRMA.  See id. at 33–34.  However, many of the cases the government relies on for this proposition do not, in fact, support it.  For instance, in Dorsey v. United States, the Supreme Court had to decide whether people who committed drug crimes before a more lenient sentencing statute was passed but were not sentenced until after it came into effect should be subject to the original penalties or the new, more lenient ones.  567 U.S. 260, 264 (2012).  Some lower courts had read the General Savings Statute to require them to apply the stricter standards.  Id. at 273.  The Supreme Court, however, disagreed.  It noted that the General Savings Statute, by its terms, preserved an old statute unless the repealing law "expressly provide[d]" otherwise, but observed that courts have long recognized that the Savings Statute is not to be taken literally.  See id. at 273–74.  This was so, the Court said, "because statutes enacted by one Congress cannot bind a later Congress, which remains free to repeal the earlier statute, to exempt the current statute from the earlier statute, to modify the earlier statute, or to apply the earlier statute but as modified."  Id. at 274.  "And," the Court made clear, "Congress remains free to express any such intention either expressly or by implication as it chooses."  Id.

Similarly, in De La Rama S.S. Co. v. United States, which the Government also relies on, the Supreme Court seemingly recognized that the "general rule" established by the General Savings Statute does not always bind a future Congress that repealed some law.  See 344 U.S. at 388–89.  In Warden, Lewisburg Penitentiary v. Marrero, the Supreme Court took this principle even further, observing that Congress enacted the General Savings Statute primarily to guard against inadvertent repeals or abatements, but that it "does not ordinarily preserve discarded remedies or procedures."  417 U.S. 653, 660–61 (1974). Thus, while the General Savings Statute creates "an important background principle of [statutory] interpretation," it is not on its own dispositive.  Dorsey, 567 U.S. at 274.

The General Savings Statute does not create the only background principles of law that must be considered when the Court interprets the FAST Act's effect on the parties' pre-FAST Act rights and responsibilities under FOGRMA.  One of the other principles that must be considered is what BP refers to as the "fundamental tenet of appropriations law that the government cannot disburse funds unless Congress has provided both the authority and source of funds to do [so]."  Dkt. 35 at 16; see also U.S. Const. art I, § 9, cl. 7.  This precept is embodied in the Anti-Deficiency Act, 31 U.S.C. § 1341, which prevents the Government from spending money that has not been appropriated.

As described above, Section 32301 of the FAST Act struck the former 30 U.S.C. § 1721(h), which instructed ONRR to pay royalties from "amounts received as current receipts," and modified the former § 1721(j) to remove ONRR's authority to make overpayment interest payments.  Congress did not explicitly state in Section 32301 whether it intended this repeal to impact ONRR's ability to make overpayment interest payments on overpayments that occurred before the FAST Act was enacted.  See Pub. L. No. 114-

94, § 32301, 129 Stat. 1312, 1741 (2015).  The General Savings Statute and the Anti-Deficiency Act counsel conflicting interpretations; the General Savings Statute, if it applies, would require the Court to ignore the FAST Act for the purposes of deciding BP's claims, whereas the Anti-Deficiency Act would require the Court to find that ONRR had no authority to pay BP any overpayment interest as soon as the FAST Act was enacted, because there was no current appropriation to support making those payments.

In its opinion denying the Government's previous motion to dismiss, the Court wrote that:

> [B]ased on the FAST Act's text, Congress's intent is clear.  Section 32301 repealed the only non-definitional provisions of FOGRMA that reference interest on royalty overpayments.   Therefore, the Court concludes that Congress's intent [to carve overpayment interest claims out of FOGRMA's remedial scheme] is unambiguous, and thus, Section 32301 of the FAST Act is not open to contrary . . . interpretation.

BP Am. Prod. Co., 142 Fed. Cl. at 454.  The Government's fresh reliance on the General Savings Statute certainly complicates the analysis, but ultimately it cannot overcome the Anti-Deficiency Act's countervailing statutory demand or the plain text of Section 32301. Congress did not intend to preserve any fraction of ONRR's authority to make overpayment interest payments.

This reading of the FAST Act is bolstered by examining where Congress placed Section 32301 in the Act.  Section 32301 is part of Title XXXII of the Act, its "Offsets" section.  Pub. L. No. 114-94, 129 Stat. 1312, 1729 (2015).  By removing ONRR's authority to make overpayment interest payments, then, Congress intended to save itself money.  It would fly in the face of this purpose for the Court to find that Congress's unexpressed intent was to allow ONRR to continue spending unappropriated funds through the machinations of the General Savings Statute.  Instead, it remains clear that Congress's intent was to carve overpayment interest claims out of FOGRMA's remedial scheme.  BP Am. Prod. Co., 142 Fed. Cl. at 454.

The Court is aware of an opinion in a factually similar case, BP Exploration & Production, Inc. v. United States, in which Senior Judge Lettow held that the General Savings Statute preserved a company's pre-FAST Act rights and responsibilities under FOGRMA.  See No. 18-972C, 2020 WL 1294658, at *13–15 (Fed. Cl. Mar. 18, 2020). Specifically, Judge Lettow held that "[t]he Federal Savings Statute establishes an interpretive premise that has to be applied by the interpreter; the result produced here is that absent any express repeal of existing liabilities and the related interest accrual provisions, Congress left those provisions intact." Id. at *14.  The Court agrees with Judge Lettow's conclusion that the FAST Act did not destroy lessees' rights to recover overpayment interest earned before the FAST Act took effect.  It respectfully disagrees,

however, with the premise that the General Savings Statute must be applied when interpreting how the FAST Act impacted FOGRMA. Instead, as explained above, the General Savings Statute should be considered in concert with the Anti-Deficiency Act and the FAST Act's plain text when interpreting how the FAST Act affected FOGRMA.

\*\*\*

For these reasons, the Government's motion to dismiss for lack of subject-matter jurisdiction is DENIED.

II. <u>Cross-Motions for Summary Judgment</u>

A. <u>Standard of Review</u>

Motions for summary judgment are governed by Rule 56 of the Rules of the United States Court of Federal Claims. Rule 56 says that summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." RCFC 56(a). Summary judgment is appropriate in this case because the parties have stipulated to the relevant facts and all that remains to be decided is the purely legal dispute over whether the FAST Act applies retroactively. See <u>id.</u>; <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322–23 (1986).

B. <u>The Government's Motion for Summary Judgment</u>

In the alternative to its motion to dismiss, the Government moves for summary judgment on prudential exhaustion grounds. Dkt. 36 at 45. The Government contends that even if the Court excuses BP's failure to exhaust its administrative remedies and file a suit within 180 days as a jurisdictional matter, the Court should nonetheless grant the Government summary judgment on these grounds as a prudential matter. Dkt. 42 at 25. The Court is unpersuaded by this argument.

In considering whether the prudential exhaustion requirement applies, courts weigh equitable factors and study whether exhaustion protects agency authority or increases judicial efficiency. See <u>McCarthy v. Madigan</u>, 503 U.S. 140, 145 (1992); <u>Hettinga v. United States</u>, 560 F.3d 498, 501 (D.C. Cir. 2009). Equitable factors such as futility and an agency's inability to grant the requested relief weigh against applying a prudential exhaustion requirement; failure to pursue an administrative remedy purely out of a belief that you will not prevail weighs in favor of applying it. See <u>McCarthy</u>, 503 U.S. at 148 (inability to grant relief); <u>Biafora v. United States</u>, 773 F.3d 1326, 1330 (Fed. Cir. 2014) (futility); <u>Cook v. United States</u>, 123 Fed. Cl. 277, 306 (2015) (expecting not to prevail).

Here, the equitable factors weigh in favor of waiving any prudential exhaustion requirement. To begin with, it would have almost certainly been futile for BP to appeal ONRR's determination that it did not have the statutory authority to make overpayment interest payments, because as discussed above, ONRR in fact did not have the authority to make those payments. Counsel for the Government has advanced many legal theories, discussed above in reference to its motions to dismiss, that would have allowed ONRR to make the overpayment interest payments despite the enactment of the FAST Act. It is certainly plausible that had BP chosen to appeal ONRR's determination that it did not have the authority to make the payments, ONRR would have reconsidered its position, adopted one of these theories, and made the payments. However, this seems particularly unlikely given ONRR's subsequent actions. To this day, ONRR maintains that it does not have the authority to make overpayment interest payments. Late Payment & Underpayment Interest Tables, Office of Natural Resources Revenue, https://www.onrr.gov/ReportPay/interest.htm (last accessed April 24, 2020). ONRR maintains this view despite the Department of Justice taking the contrary view in this case and another entity appealing this very issue to the Director of ONRR. See BP Exploration, 2020 WL 1294658, at *13–15.

Just as the equitable factors weigh in favor of waiving the prudential exhaustion requirement, so too do the interests of agency authority and judicial efficiency. BP did not come to this Court hoping to undercut ONRR's authority by obtaining a ruling contrary to that given by ONRR. Indeed, BP agreed with ONRR's legal interpretation that ONRR could not pay overpayment interest, and ONRR agreed with BP's factual interpretation that ONRR owed BP overpayment interest. Administrative exhaustion would have served no purpose other than for the parties to continue to agree with one another. It would have done nothing to promote agency authority or judicial efficiency.

The Court will not punish BP for failing to appeal an agency decision with which it ostensibly agrees. In this case, exhaustion for the sake of exhaustion would merely have wasted the time and resources of the parties and produced no benefit for anyone. Accordingly, the Government's motion for summary judgment is DENIED.

### C. BP's Motion for Summary Judgment

BP moves for summary judgment on the grounds that the FAST Act eliminated ONRR's ability to make overpayment interest payments but did not retroactively eliminate ONRR's obligation to do so. Dkt. 35 at 15–20. This means, BP says, that this lawsuit is the only means by which it can acquire the money that it is owed. Id. at 20–21. The Court previously ruled that "[t]he FAST Act . . . eliminated ONRR's source of authority and source of funds for paying or crediting overpayment interest." BP Am. Prod. Co., 142 Fed. Cl. at 451, 453–54. It has reaffirmed this ruling today. See supra Analysis Part I.B. Therefore, the only two questions to be resolved are whether Congress intended the FAST Act to retroactively eliminate ONRR's obligation to make overpayment interest payments,

and whether BP is entitled to recoup its interest through this litigation.  The Court answers the first question in the negative and the second question in the positive.

When considering whether a statute applies retroactively, courts apply the two-pronged approach outlined in Landgraf v. USI Film Products, 511 U.S. 244 (1994).  In that case, the Supreme Court explained that "[w]hen a case implicates a federal statute enacted after the events in suit, [a] court's first task is to determine whether Congress has expressly prescribed the statute's proper reach."  Id. at 280.  If Congress has done so, the case ends there.  Id.  However, if "the statute contains no such express command, the court must determine whether the new statute would have retroactive effect, i.e., whether it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed."  Id.  If under this framework "the statute would operate retroactively, [the] traditional presumption [is] that it does not govern absent clear congressional intent favoring such a result."  Id.  The presumption against retroactivity is strong; the Supreme Court has made clear that "[r]etroactivity is not favored in the law."  Bowen v. Georgetown Univ. Hosp., 488 U.S. 204, 208 (1988).  Similarly, the Federal Circuit has counseled that statutes should not be construed as retroactive absent "clear evidence that Congress intended" them to be.  Hicks v. Merit Sys. Prot. Bd., 819 F.3d 1318, 1321 (Fed. Cir. 2016).

With respect to the first prong of the Landgraf test, Congress did not explicitly indicate in the FAST Act whether it intended Section 32301 to be retroactive.  Section 32301 reads in full:

**Sec. 32301. INTEREST ON OVERPAYMENT**

Section 111 of the Federal Oil and Gas Royalty Management Act of 1982 (30 U.S.C. 1721) is amended—
    (1) by striking subsections (h) and (i);
    (2) by redesignating subsections (j) through (l) as subsections (h) through (j), respectively; and
    (3) in subsection (h) (as so redesignated), by striking the fourth sentence.

Pub. L. No. 114-94, § 32301, 129 Stat. at 1741.  There can be no question, then, of Congress expressly prescribing the statute's proper reach.  It therefore falls to the Court to determine whether this provision of the FAST Act should be interpreted to implicitly have retroactive effect.

The parties agree that it should not.  BP reasons that the general presumption against retroactivity counsels against finding retroactive effect here, whereas the Government, as discussed above, argues that the General Savings Statute preserves FOGRMA in its pre-FAST Act state.  Dkt. 35 at 18; Dkt. 36 at 32.  The Court will not test the patience of its

readers by rehashing its disagreement with the Government's position about the effect of the General Savings Statute on this case. The remaining issue, then, is whether the FAST Act contains sufficient indicia of retroactivity to overcome the strong presumption that it is not retroactive.

In short, there is no such evidence. As BP notes, Congress made other portions of the FAST Act retroactive. E.g., Pub. L. No. 114-94, § 1003, 129 Stat. 1312, 1322. That Congress neglected to explicitly make Section 32301 retroactive when it had done so with other sections strongly implies that it had no intention for it to be retroactive. If it had such an intention, it surely would have made it explicit, not implied. Moreover, as BP points out, if Section 32301 were to be retroactive, there would be no limiting principle constraining its effect; ONRR would seemingly have to claw back every overpayment interest payment it had issued dating back to the program's inception in 1996. See Dkt. 35 at 19–20. Absent clear evidence to the contrary, the Court simply cannot ascribe such an intention to Congress. When Congress wishes to act retroactively, it must speak, if not explicitly, then at least clearly. See Geo. Univ. Hosp., 488 U.S. at 208. It has not done so here.

In sum, the FAST Act destroyed ONRR's ability to make overpayment interest payments by revoking its authority to issue those payments and removing their source of funding. However, the Act did not destroy ONRR's obligations to make payments on a lessee's overpayment interest that accrued before the Act took effect; the Act was not retroactive. Thus, the Government is left with an obligation to BP, but no authority to pay it. This is precisely the sort of scenario that the Court of Federal Claims is designed to remedy through its Tucker Act jurisdiction. See 28 U.S.C. § 1491(a)(1); Kane County v. United States, 136 Fed. Cl. 644, 647–48 (2018). Therefore, BP's motion for summary judgment is GRANTED.

Conclusion

For these reasons, the Government's motion to dismiss and cross-motion for summary judgment are DENIED. BP's motion for summary judgment is GRANTED. The Clerk of the Court is directed to enter judgment in favor of BP in the amount of $1,323,721.86. The parties shall bear their own costs.

IT IS SO ORDERED.

s/ Thomas C. Wheeler
THOMAS C. WHEELER
Judge